292 F.2d 206
 SEIDENBACH'S, an Oklahoma corporation, Appellant,
v.
BLAND TERRY SHOE CORPORATION, a Georgia corporation, Appellee.
BLAND TERRY SHOE CORPORATION, a Georgia corporation, Cross-Appellant,
v.
SEIDENBACH'S, an Oklahoma corporation, Cross-Appellee.
 Nos. 6583, 6584.
 United States Court of Appeals Tenth Circuit.
 June 5, 1961, Rehearing Denied July 14, 1961.
 
 Morrison Shafroth, Denver, Colo., and Frank Settle, Tulsa, Okl. (Grant, Shafroth, Toll & McHendrie, Denver, Colo., and Saul A. Yager, Tulsa, Okl., on the brief), for appellant and cross-appellee.
 Charles P. Gotwals, Jr. (of Gable, Gotwals & Hays), Tulsa, Okl., for appellee and cross-appellant.
 Before BRATTON, LEWIS and BREITENSTEIN, Circuit Judges.
 LEWIS, Circuit Judge.
 
 
 1
 This is an action for an accounting brought by Bland Terry Shoe Corporation against Seidenbach's with jurisdiction based upon diversity of citizenship and a claim for $12,434.25 alleged due under a contract which had governed the relationship of the parties from January 1950 until January 1959. Seidenbach's is an established department store in Tulsa, Oklahoma; Bland Terry is a Georgia corporation operating a chain of leased shoe departments in comparable outlets throughout the nation. Judgment favored Bland Terry in the sum of $8,718.20 based upon the trial court's allowance of some of Seidenbach's disputed credits against the claim and the disallowance of other claimed credits. By appeal and cross-appeal, the parties seek review of the various items considered by the trial court. The appellant Seidenbach also raises, and for the first time on appeal, a jurisdictional question which requires preliminary consideration of whether proof of compliance with the Oklahoma Intangible Tax Law, 68 O.S.A. 1515, is a condition precedent to the bringing of this action. The statute provides:
 
 
 2
 'In every action or suit in any court for the collection of any bond, note, account receivable, or other intangible personal property as defined in Section 1 of this Act, the plaintiff must allege and prove:
 
 
 3
 'That such intangible personal property sued upon has been assessed for taxation under the provisions of this Act for every tax year during which he was the owner of same, and that all taxes, together with accrued interest and penalties, assessed upon the property for such period, have been paid; provided, that the plaintiff shall not be required to prove assessment and payment hereunder for a period of more than three (3) fiscal years prior to the time of bringing his action, nor for any period of time in which the subject of his action was not taxable under this Act; and provided further, if such intangible property is not subject to such taxes he may so alletd, stating the controlling facts upon which is based such allegation.
 
 
 4
 'If the petition or complaint of the plaintiff fails to make the allegations herein prescribed, or if he fails to prove facts supporting such allegations when made, the action must be dismissed upon demurrer or motion of the defendant, or by the court on its own motion.'
 
 
 5
 It is conceded that Bland Terry neither alleged nor proved any facts pertaining to the assessment or taxation of the basis of its claim and that if such is necessary through the compulsion of the statute that this action must now be dismissed or remanded to the trial court for proof of statutory compliance. The question of compliance is jurisdictional and may be raised for the first time on appeal. Harris v. Conway, Okl., 343 P.2d 1069; Britton v. Dowell, 10 Cir., 237 F.2d 630.
 
 
 6
 The Oklahoma intangible tax is not a privilege or occupation tax and is not a tax on net income. It is a specific tax on intangibles in lieu of an ad valorem tax. In re Harris, Upham & Co., 194 Okl. 155, 148 P.2d 191. To come within the impact of the statute the debt sought to be recovered must fall within the definition of 69 O.S.A. 1501[1] and have a business situs within the state as contemplated under 68 O.S.A. 1504.[2] An understanding of the nature of Bland Terry's claim is therefore necessary as a premise to a consideration of the adequacy of the pleading.
 
 
 7
 In its broadest aspect the contract between the parties provided for the furnishing of space within the Seidenbach's store for the retail sale of Bland Terry shoes sold through Bland Terry personnel but so operated as to appear to be an integrated part of Seidenbach's. No displays indicated to the buying public the presence of the leasing firm and Seidenbach's accepted customer responsibility for the Bland Terry shoes to the same extent as for its own merchandise in other departments of the store. Credit sales were collected by Seidenbach's and the gross receipts from cash sales were reported to Seidenbach's and the proceeds turned over to that firm. Seidenbach's handled the accounting and returned to Bland Terry on the fifteenth of each month the amounts collected less expenses paid by the store for Bland Terry and less twelve per cent of the gross sales for use of the premises. The instant suit was brought by Bland Terry to recover the amount of money in Seidenbach's possession as a result of business done during the final two months of the parties' dealings, but during trial and on appeal Seidenbach's has raised issues concerned with events occurring during the entire relationship.
 
 
 8
 In contending that proof of compliance with the Oklahoma Intangible Tax Law is a condition precedent to this action, Seidenbach's likens the present case to the case of Edmonds v. White, 203 Okl. 231, 219 P.2d 1007, which held that a rental contract, breached by the lessee-defendant, was a 'bill receivable' or a 'credit' within the meaning of the statute. However, in that case, it was held that the chose in action was taxable to the lessor as owner of the obligation and cannot be correlated with this case where the lessee seeks to obtain money withheld as a result of an accounting arrangement.
 
 
 9
 Although Seidenbach's recognizes that its disputation of a right to a guaranteed minimum, to be discussed later, rendered a satisfactory accounting between the parties impossible, it contends that the amount due for the month of December, 1958, was liquidated by agreement between the parties and hence should have been registered for assessment before March 15, 1959. A dispute as to the fiscal year minimum did not arise until January 15, 1959; therefore, appellant contends that this could not cause the amount to be uncertain so as to excuse compliance with the tax assessment law, Cravens v. Hughes, 207 Okl. 503, 250 P.2d 877. The fact that certain matters are unliquidated will not render the entire debt non-assessable where claims are separable, Rogers v. Goodwin, 208 Okl. 110, 253 P.2d 844. However, the trial court found the entire claim to be unliquidated, and we believe correctly so. The definition of 'liquidated account' is not peculiar to the statute and the Supreme Court has held that a liquidated account is one the amount of which is agreed upon by the parties or fixed by operation of law, Gasper v. Mayer,171 Okl. 457, 43 P.2d 467. But the evidence of agreement as to the amount due from Seidenbach's to Bland Terry is far from convincing that the parties ever reached any accord on any separable claim as of the assessment date. An undated statement of account struck as of February 28, 1959, showed an amount due Bland Terry for the month of December 1958 of $9,355.01; on April 3, 1959, Bland Terry agreed to accept this figure as representing net sales less payments made for the Bland Terry account. In the meantime, the arguments between the parties over other matters had increased so that on October 2, 1959, Seidenbach's answered Bland Terry's interrogatory:
 
 
 10
 'Defendant attempted to make complete settlement with the plaintiff but was unable to agree with plaintiff on a (for the month of December) settlement.'
 
 
 11
 For this reason and the entire nature of the dealings between the parties, it appears that this case falls within the rule of Lumbermen's Supply Co. v. Neal, 189 Okl. 544, 119 P.2d 1017, and the precise language of Dunlap v. Spencer, 191 Okl. 557, 131 P.2d 994, 996:
 
 
 12
 '* * * The statute does not contemplate a mere cause of action for money due or credits claimed under a contract where the debt or credit arose by reason of a system of mutual dealings between the parties resulting in reciprocal demands. That is to say, a mere cause of action for money allegedly due or to establish a credit as arising out of a business arrangement carried on under a system of mutual account does not constitute intangible property such as is required to be rendered for taxation under the Intangible Tax Law.'
 
 
 13
 Illustrations of similar claims held to be beyond the reach of the statute are found in Seval v. Hunt, 198 Okl. 227, 177 P.2d 673; Cole v. Harvey, 200 Okl. 564, 198 P.2d 199. We conclude that proof of compliance with the Oklahoma Intangible Tax Law is not a jurisdictional block to consideration of the case upon the merits.
 
 
 14
 Although the broad aspects of the parties' contract are simple in purpose the actual complexities of operations were many and necessitated a written understanding upon a multitude of details. As a consequence, the contract was amended many times and in some instances the parties solved their difficulties by practice rather than formal amendment. Upon final accounting, sharp lines of controversy were drawn on all aspects of the contract, its terms, definitions, and purpose, forcing the trial court into an examination of minutiae some of which have survived to this court.
 
 
 15
 Seidenbach's has contended that the fourth amendment to the contract, dated October 4, 1955, changed the fiscal year closing date from January 14 to November 30. At the trial, this issue had significance to the determination of whether or not the sales for the year 1957-1958 had achieved a volume exceeding the guaranteed minimum of $265,000 upon which Bland Terry was to pay rent. This particular question became moot by reason of the trial court's ruling that certain unreported sales were not within the excluded category of 'sales to jobbers in job lots at cost or lower,' with the consequence that the licensee was required to pay twelve per cent rental upon sales actually made, which exceeded the guarantee.
 
 
 16
 With respect to the final year's business, the issue as to the proper fiscal year for the accounting is important only if it be determined that the guarantee was still in effect. It is undisputed there was a failure to achieve the $265,000 regardless of the definition of fiscal year and if the contract provision for a guarantee was applicable the determination of the amount of shortage depends upon the closing date. But the trial court found:
 
 
 17
 '* * * that the plaintiff had the option of either paying or not paying defendant the percentages fixed for rental upon the difference between the guaranteed minimum amount for any one year and the actual gross sales for such period in addition to the percentage on the actual gross sales attained, and that plaintiff exercised such option to forthwith refuse to pay any such difference; the court further finds that plaintiff was at that time of the opinion in good faith that they had not made the minimum sales required and, consequently, did exercise the option. * * *'
 
 
 18
 The trial court here refers to a letter written by Bland Terry, president of the Bland Terry Shoe Corporation, on January 15, 1958, and sent by registered mail to Seidenbach's:
 
 
 19
 'Gentlemen: Under the terms of the License Agreement which we have with you the fiscal year expires on January 15th. Our records indicate that the gross sales from our departments for the fiscal year which ended January 15, 1958 will be less than $265,000.00. Our lease provides that if the volume of business during such a period was not equal to $265,000.00, then we have the right to either pay you an agreed percentage on the difference between the guaranteed minimum amount and the actual gross sales for such period, or we shall have the right to refuse to pay such difference.
 
 
 20
 'This is to advise you that we do not desire to pay any rental in excess of that due on sales actually made, and we therefore exercise the privilege given us of refusing to pay this difference. You should of course govern yourself accordingly.'
 
 
 21
 To this letter, Mr. Seidenbach replied on January 21, 1958:
 
 
 22
 'Dear Mr. Terry: This replies to your letter of January 15, that concludes stating 'govern yourself accordingly.' Such admonition, we believe useless, because our fiscal year was changed by amendment signed October 4, 1955, to begin on the first day you commenced operation in the new space on our Mezzanine floor. Such was December 1, 1955. It was agreed that you increase your guarantee from $200,000.00 to $265,000.00 (subject to certain conditions), after you commenced operations in the larger and more desirable space on our Mezzanine floor . . ..
 
 
 23
 'Even if such fiscal year date had not been so changed, it is difficult for us to understand how during the day of January 15, you could know in Atlanta that your sales volume for the prior twelve months would not attain the sum of $265,000.00. You certainly did not have any final including outstanding approvals. Even in such period, that you now wrongfully refer to as a fiscal year, your sales will have been not less than about $264,500.00. Under such circumstances, your deficit would be about only 12% of $500.00, or the sum of only $60.00.
 
 
 24
 'Surely, such a small sum is of no great importance to either of us in a more than a quarter of a million dollar business, so it appears that you are not too pleased with the situation here. As you well know, several times, your discontinuing has been considered. If that is your wish now, why not frankly so advise me, rather than to send a letter such as yours of January 15, that has no real basis in our agreement.
 
 
 25
 'Now, if you wish to sever relationship, let us do so, in accord with the last paragraph of your letter of August 23, 1954. * * *'
 
 
 26
 The record contains no evidence that Bland Terry replied to this letter to dispute the construction of the contract with relation to the fiscal year or the figures for that year and Seidenbach's took no action to terminate the contract on the succeeding July 14, as permitted by contract.[3] On October 16, 1958, however, the parties provided for the dissolution of their business arrangements as of January 14, 1959, by the following contract:
 
 
 27
 '* * * Inasmuch as it is the mutual desire of the parties herein above named to terminate such agreement on January 14, 1959, it is herein and hereby so agreed, with the further agreement that all the terms and conditions set forth in such agreement, the modifications and extensions shall remain in full force and effect until January 14, 1959, instead of terminating on January 14, 1961, as heretofore provided therein, and the further exception herein set forth.
 
 
 28
 'It is further understood and agreed that Seidenbach's shall have the option to buy all of Bland Terry Shoe Corporation's fixtures, furniture, shelving, rugs, equipment of every kind in Seidenbach's, except the shoes and records of Bland Terry Shoe Corporation, for the sum of Five Thousand ($5,000.00) Dollars, such option shall remain in effect until December 15, 1958.
 
 
 29
 'It is further understood and agreed that Bland Terry Shoe Corporation shall not sell any of the shoes, or permit anyone who may purchase its shoes in job lots, or bulk, to sell such shoes in the State of Oklahoma, except in Seidenbach's store, for a year after the license agreement is terminated, and shall protect Seidenbach's from any damage from such shoes being so sold; provided this clause shall not prevent sale of shoes in job lots or bulk in Oklahoma for resale in other states.
 
 
 30
 'Seidenbach's agrees to exert its best efforts to assist Bland Terry Shoe Corporation in selling the residue of its stock of shoes to any successor firm that may succeed Bland Terry Shoe Corporation in licensing Seidenbach's Shoe Department, but Seidenbach's has no obligation to buy such stock of shoes from Bland Terry Shoe Corporation.
 
 
 31
 'It is understood that Bland Terry Shoe Corporation shall have the right during the remainder of the term to gradually reduce and liquidate the stock of shoes owned by it in connection with the operation of the shoe departments at Seidenbach's, and the Bland Terry Shoe Corporation shall have the right to promote such reduction in stock and liquidation of its inventory by the means of promotional sales in said departments and during the remainder of its lease the licensee is relieved of those provisions of the licensing agreement requiring it at all times to 'carry a stock of saleable and suitable merchandise comparable to, and such as is carried in the best of exclusive articles to be handled by the Licensor in its various departments * * * and to use its best efforts to make said department a successful one.' While the Licensee will continue to be bound by the provisions of Section 24 of the original agreement, this section shall not be construed to prohibit the grandual liquidation and reduction of the inventory of said departments in contemplation of the termination of the lease and the conduct of promotional sales herein authorized, it being expressly understood that no auction sale shall be conducted in said departments. * * *'
 
 
 32
 Despite the language of the paragraph first above quoted, the trial court evidently regarded this contract as abrogating the prior provision relating to the parties' rights with regard to a guaranteed minimum of sales in the determination of rents due, although it made no specific finding on the matter. It is clear that the final amendment to the contract contemplated liquidation of stock which would necessarily reduce the amount of business to be anticipated. Further, the fact that the final date of business was named as January 14, 1959, left Seidenbach's with an empty right if Bland Terry exercised its option to refuse to pay amounts in excess of that due by reason of business actually done, for its redress lay only in terminating the contract as of the following July. Such a situation creates a conflict in the provisions of the contract and reason requires an affirmation of the trial court's solution.
 
 
 33
 It must be assumed that Seidenbach's agreed to accept the former minimum guarantee of $200,000 along with its right to terminate the contract if Bland Terry saw fit to exercise its option, for the language of the amendment is capable of no other interpretation; it is only the effect of the agreement to terminate at an earlier than anticipated date which renders confusion. Since it would be illogical for a business in the act of liquidating to fail to exercise such an option unless contractually pressed to do so by other considerations not apparent here, the failure of the contract to mention the guarantee is evidence of the intention of the parties to abandon the $265,000 guarantee. There is no occasion to determine what the situation would be had not the $200,000 guarantee been met, for the gross sales for the year 1958-1959 exceeded that figure.
 
 
 34
 Bland Terry did in fact give notice of its refusal to pay the rental due under the guarantee on January 20, 1959; assuming that notice was required (it is nowhere so stated in the contract) the notice was timely if the fiscal year concluded on January 14, as found by the trial court. However, since we have determined that the guaranteed minimum provision was not applicable to the final year's business, it is unnecessary to review the evidence which is adequate to support the trial court's finding on this phase of the case.
 
 
 35
 Over the life of the contract, certain sales were made and unreported by Bland Terry from stock on hand at Seidenbach's. Certain of these matters were settled during pre-trials and trial, but the appellant asserts error in the trial court's ruling concerning certain sales made in bulk and unreported by Bland Terry on the theory that they were sales to jobbers in job lots. The trial court accepted the definition of a jobber given by Mr. Seidenbach-- 'A jobber is a merchant who buys in small lots of broken sizes, and more or less undesirable merchandise, and then sells it in bulk to a retailer to be finally sold at retail by the retailer, to the final consumer.' Bland Terry Shoe Corporation submitted, upon the request of Seidenbach's, a list of sales made and unreported for purposes of tallying rents due from 1950 to 1957. The appellant proved to the court's satisfaction in seven of these sales the buyer bought for the purpose of retailing rather than for resale to a retailer, although it is conceded that a buyer may be both a jobber and a retailer.
 
 
 36
 Because the trial court did not require Bland Terry to make further proof of the status and purpose of each buyer shown on the affidavit of the Secretary of that corporation, appellant asserts that the burden of proof was improperly shifted to the defendant. Suffice it to say that the Delony affidavit stated that the shoes listed were sold in job lots at a price less than the cost of shoes to the Bland Terry Shoe Corporation to jobbers and, under the ordinary rules of evidence, the burden of going forward with evidence to demonstrate a contrary assertion must necessarily fall to Seidenbach's.
 
 
 37
 Another item of dispute between the parties concerns which of the two is entitled to credit to amounts received as deposits on layaway items but forfeited by the customer who failed to complete payment, a total over the 9-year period of $1,680.96.
 
 
 38
 The contract permits the matter to be governed by subsequent arrangement and the evidence shows that a different practice was agreed to than was ultimately practiced. Seidenbach's urges that because it remained obligated to the customer in the event of future recollection it should receive the forfeited deposits; Bland Terry counters with the proposition that it suffered some damage as a result of holding the merchandise for a period of time which may cause a loss of value in fashion items or size restrictions and hence is entitled to retain the deposits. The trial court awarded the amount to Bland Terry chiefly because Seidenbach's had controlled the accounting of the business and had thus acquiesced in and even participated in the distribution of the amounts to the shoe corporation. There appears no reason for disturbing the trial court's exercise of discretion and judgment as to this item.
 
 
 39
 Finally, Seidenbach's made claim for $110.86 as insurance premium paid on Bland Terry's account to protect merchandise in layaway storage on the Seidenbach's premises; it asserts that the insurance coverage was orally requested by Bland Terry's store manager and provided despite the language of the written contract:
 
 
 40
 '27. No moneys shall be paid out by the Licensor for the account of the Licensee excepting on vouchers signed by the manager, or such other person as may be designated by the Licensee for such purpose. Licensor will advance moneys to cover freight and express charges and Licensee's payroll, from sums received by Licensor from Licensee's sales when proper voucher is presented.'
 
 
 41
 Apparently, there was a duplication of insurance if the merchandise insured belonged to Bland Terry, for that company also had insured all of its stock. The trial court found that the payment of such premium was not authorized by the terms of the written contracts and under the parties' interpretation of their contract, it was not the practice, custom, or method of the parties to charge such amount to the licensee.
 
 
 42
 Bland Terry, as cross-appellant, urges that the language of paragraph 27 also precludes the trial court's finding that
 
 
 43
 '* * * from the uncontroverted testimony of President of defendant, there was an oral arrangement that defendant did advance insurance premiums for the account of plaintiff on shoes shipped by parcel post to customers and consignees of plaintiff for which defendant has never been reimbursed, in the amount of $1,419.88, and that defendant is entitled to offset such amount against any amount owing plaintiff.'
 
 
 44
 Cross-appellant admits that in actual practice it would have been impossible for vouchers to have been made for these parcel post insurance payments as there were some 35,000 packages shipped over the nine years of the license, but insists that either vouchers must be rendered or that insurance was an item included in Seidenbach's promise to furnish 'shipping and receiving room services.' Since, over the years, the monthly statements by Seidenbach's did not claim these insurance payments, Bland Terry asserts that the oral agreement cannot modify the written contract contrary to 15 O.S.A. 237:
 
 
 45
 'A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise.'
 
 
 46
 The obvious answer to such argument is that the oral agreement did not vary the contract terms but merely provided for a necessity not covered by the written contract. The trial court so held and must be affirmed.
 
 
 47
 The judgment is affirmed.
 
 
 
 [1]
 68 O.S.A. 1501: 'As used in this Act, the term 'intangible personal property' means and includes the following:
 '(c) Accounts and bills receivable, including brokerage accounts and other credits, whether secured or unsecured.
 '(f) All interests in property held in trust or on deposit within or without this State, and whether or not evidenced by certificates, shares, or other written evidence of beneficial ownership. * * *'
 
 
 [2]
 68 O.S.A. 1504: 'All intangible personal property, as defined in Section 1, shall be deemed to have a taxable situs in this State where such property is owned by:
 '(b) A non-resident individual, firm, association, executor, administrator, trustee or other fiduciary, foreign corporation, or other business organization, where such property has acquired a business situs in Oklahoma.
 '(c) A corporation organized under the laws of another state, the business of which corporation is managed, directed, and controlled from within the State of Oklahoma. Management, direction, and control of the corporation's business shall be deemed to be within the State of Oklahoma where the corporation (a) transacts in Oklahoma its principal business, or (b) matains in this State its 'business domicile' or 'commercial domicile.' Intangible personal property owned by a corporation organized under the laws of another state shall not be subject to the tax levied under this Act, where such property can be deemed to have been localized and to have acquired in some other state a business situs.'
 
 
 [3]
 The fifth of the six amendments to the contract, dated Oct. 4, 1955, replaces the guarantee provisions of the other documents with the language:
 'The Licensee guarantees that minimum amount of gross sales from the said departments in any one fiscal year shall not be less than Two Hundred and Sixty-five Thousand Dollars ($265,000.00), and if the volume of business of the Licensee during any such period shall not be attained to equal such minimum amount, then the Licensee agrees that it will within Thirty (30) Days, after the end of such fiscal year involved, pay to the Licensor the percentages herein before agreed upon on the difference between the said guaranteed minimum amount, and the actual gross sales for such period, in addition to such percentage on such actual gross sales attained; or the Licensee shall have the right to forthwith refuse to pay such difference.
 'In such latter event, the Licensor shall have the option to, within ten days thereafter, either cancel this entire agreement, in which event same shall expire on the next succeeding July 14, as fully as if that date had been fixed for the expiration of the term of this Agreement, rather than January 15, 1961; or the Licensor shall have the option to accept the refusal of the Licensee to pay the aforesaid difference, and the Licensee shall then be under no obligation to pay Licensor such additional guaranteed rental except as herein after set forth, and the agreement in such event will remain in full force and effect, except that the guaranty of $265,000.00 will be cancelled, and the balance of the Agreement as amended, including Paragraph 3 (three) of the agreement as amended November 11, 1949, will remain in full force and effect.'
 (Former paragraph 3 provided for a $200,000.00 minimum.)